The Estate of Barnet L. Rosset, Deceased, Barnet L. Rosset, Jr., and the Continental Illinois National Bank and Trust Company, Executors, v. Commissioner. Estate of Barnet L. Rosset, Deceased, Barnet L. Rosset, Jr., and the Continental Illinois National Bank and Trust Company, Executors, and Mary E. Rosset v. Commissioner.
Estate of Rosset v. Commissioner
Docket Nos. 39500 and 39501.
United States Tax Court
T.C. Memo 1954-241; 1954 Tax Ct. Memo LEXIS 7; 13 T.C.M. (CCH) 1193; T.C.M. (RIA) 54346; December 30, 1954, Filed *7 1. Decedent, Barnet L. Rosset, was the major stockholder and president of a trust company. He acted as trust manager, corporation officer or director in various corporate reorganizations which the trust company handled. He also appraised property and operated the Office of Public Administrator of Cook County, Illinois, for the trust company. He paid over to the trust company most of the fees received from such activities. Held, the amounts received by decedent and paid over to the trust company were received in his capacity as its employee or agent and were not includible in his gross income. Held, further, decedent was entitled to no loss deduction allegedly incurred in operating the Public Administrator's Office in 1945, since he did so as an agent of the trust company. 2. The trust company paid traveling expenses incurred by decedent in its behalf; he also drew sums from it, the Public Administrator's Office, and a partnership for entertainment expenses. Decedent incurred expenses in behalf of all three. Held, traveling expenses paid by the trust company were not dividends to decedent, nor includible in his income. Held, further, amounts withdrawn by decedent from the three sources *8 above indicated were includible in his gross income; but, he incurred deductible expenses in connection with his services to each. Held, further, decedent improperly failed to report $500 received by him in 1944 from the trust company arising out of the sale of an automobile. 3. Held, decedent received miscellaneous fees of $775 in 1941 which he improperly failed to report on his return for that year. 4. In 1931, decedent and two other officers of the Phillip State Bank guaranteed deposits in such bank by the Treasurer of Cook County, Illinois. Decedent was, at that time, the major stockholder of the bank. The bank was closed in 1932. In 1941, decedent and the other guarantors settled their liability on the guarantee. Decedent paid $20,000 at that time and incurred legal fees in connection therewith of $500 in 1941 and of $1,500 in 1944. Held, decedent was entitled to a bad debt deduction under section 23(k)(1) of the 1939 Code for the payment on his guaranty. Held, further, legal fees paid in connection therewith are deductible under section 23(e)(2) of the Code. 5. Decedent loaned $1,000 to one William Siegel in 1940. Siegel filed a petition for bankruptcy in December 1942. Decedent *9 made no effort to collect the loan and subsequently loaned Siegel and another $50,000 on a secured note in 1943. Held, decedent failed to prove that the loan became worthless in 1942 when he claimed a bad debt deduction therefor. 6. Held, decedent failed to prove that he was entitled to report compensation received by him in 1942 under the provisions of section 107(a) of the 1939 Code. 7. Held, decedent improperly failed to report $10 withheld for social security taxes by a corporation of which he was an officer in 1942; and failed to prove that $100 he received in 1942 was reported on his return for that year. 8. In 1942, decedent received $137.56 from a corporation on its certificate of indebtedness and reported such sum as a long-term gain. Held, respondent correctly determined that such sum was ordinary income to decedent. 9. In 1942, petitioner, Mary E. Rosset, received a capital distribution on shares of the Madison Park Hotel Company. On some of the shares she received more than their cost; on others she received less than their cost. The net amount of the distribution was greater than the cost of all of the shares, and she reported the excess as a long-term capital gain on *10 her return for that year. She retained the shares. Held, respondent correctly determined, pursuant to section 115(d), that all of the gain on those shares on which the amount of distribution was greater than cost should be reported and that the distribution on other shares, which was less than their cost, served merely to reduce the basis of such shares. 10. Held, the evidence failed to show that shares of stock, which decedent alleged became worthless in 1943, had any value at the beginning of, that year and the deduction claimed is, therefore, disallowed. John S. Miller, Esq., 134 South La Salle Street, Chicago, Ill., and M. Manning Marcus, Esq., 1329 E. St. N.W., Washington, D.C., for the petitioners. George T. Donoghue, Jr., Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion RICE, Judge: These consolidated proceedings involve deficiencies in income tax and penalties for fraudulent evasion thereof determined by the respondent as follows: Docket
Fraud
Petitioners
Numbers
Years
Deficiencies
Penalties
Estate of Barnet L. Rosset, Deceased,
et al.
39500
1936
$17,714.32
$ 8,857.16
1937
32,195.96
16,710.98
1938
31,977.44
15,988.72
1939
23,605.09
11,802.55
1940
19,101.34
9,582.75
1941
26,548.25
18,393.24
1942
11,911.63
5,955.82
1944
39,802.35
19,901.18
1945
39,071.33
19,535.67
1946
56,813.77
28,406.89
Estate of Barnet L. Rosset, Deceased,
et al., and Mary E. Rosset
39501
1935
32,271.47
16,149.10
1943
27,409.93
13,704.97
*11 This case came here with the allegation that the decedent, Barnet L. Rosset, had fraudulently evaded a part of his income taxes for some 12 years. At the outset of the hearing, the respondent dropped the fraud charge as to the first 6 years, 1935 to 1940, inclusive, and any consideration of alleged deficiencies with respect thereto is barred by the statute of limitation. The respondent, on brief, dropped the fraud charges as to the remaining years and also conceded that the benefits of the Current Tax Payment Act of 1943 [1] are available to decedent, Barnet L. Rosset. Both parties made concessions with respect to other adjustments originally in issue and they will be taken into account in a Rule 50 computation. The remaining issues to be decided are: (1) was income received by decedent, Barnet L. Rosset (hereinafter referred to as the decedent), and paid over by him to the Metropolitan Trust Company during the years 1941 to 1946, inclusive, includible in his gross income; (2) if so, were the amounts so paid over to the trust company deductible by him as expenses; but (3) if includible in his gross income and not deductible as expenses, was he entitled to a credit for the *12 taxes paid by the trust company on such amounts; and (4) if includible in his gross income, was decedent entitled to a deduction for expenses incurred by the trust company in procuring the amounts paid over to it; (5) was decedent entitled to a deduction for losses allegedly sustained from his operation of the Office of Public Administrator of Cook County in 1945; (6) were traveling and entertainment expenses, and certain miscellaneous expenses, paid directly by Metropolitan Trust Company for decedent, and $500 paid to him in 1944 out of the proceeds from the sale of an automobile, preferential dividends, includible in his gross income; (7) were withdrawals by decedent from the trust company, the Office of Public Administrator, and Rail to Water Transfer Company for the purpose of paying expenses incurred by him, includible in his gross income; (8) if the answer to (6) and (7) is affirmative, did he incur deductible expenses; (9) did decedent improperly fail to report miscellaneous fees of $775 which he received in 1941; (10) did decedent sustain a deductible loss by payment of $20,000 in settlement of his liability on a surety bond in 1941; (11) were legal fees paid by him in 1941 *13 and 1944, in connection with such settlement, deductible; (12) was decedent entitled to a bad debt deduction in 1942 because of a loan which allegedly became worthless in that year; (13) was decedent entitled to report, under section 107(a) of the 1939 Code, certain compensation received by him in 1942; (14) did decedent fail to report $100 in fees and $10 of the total compensation received from Marmaduke Apartments, Inc., in 1942, on his return for that year; (15) was the amount received by decedent on a certificate of indebtedness of Clyde Manor Corporation, in 1942, reportable as a capital gain or as ordinary income; (16) was petitioner, Mary E. Rosset, entitled to a loss deduction because of a capital distribution by the Madison Park Hotel Company to her as one of its stockholders when the amount of such distribution was less than the cost of her shares; and (17) were decedent and petitioner, Mary E. Rosset, entitled to a deduction in 1943 for stock of the 2920 Commonwealth Building Corporation becoming worthless in that year. General Findings of Fact Decedent and Mary E. Rosset were husband and wife and residents of Chicago, Illinois, during the years in issue. Decedent filed *14 individual income tax returns for the years 1941, 1942, 1944, 1945, and 1946. Mary E. Rosset filed an individual return for 1942 and she and decedent filed a joint income and victory tax return for 1943. All such returns were filed on the cash basis with the collector of internal revenue for the first district of Illinois. This case was heard at Chicago, Illinois, on December 10, 1953. Barnet L. Rosset died on September 4, 1954. Petitioners, Barnet L. Rosset, Jr., and the Continental Illinois National Bank and Trust Company are the duly appointed executors of decedent's estate. Findings of Fact Issues 1, 2, 3, 4, and 5 Alleged Income Diverted to Metropolitan Trust Company (a) Voting trust fees, liquidation trust fees, certificates of indebtedness, interest certificates, salaries as officer and director. Prior to 1932, decedent was the controlling stockholder of several small banks in the outlying Chicago area, including the Phillip State Bank, of which he was the Board Chairman. In that year he acquired the Metropolitan Trust Company, (hereinafter referred to as Metro) for the Phillip State Bank, intending to merge the two. Shortly thereafter, the Phillip State Bank failed and decedent *15 acquired its interest in Metro. From that time, up to and including the years here in issue, decedent was president of Metro and devoted most of his time to its business. He, personally, owned not less than 74.8 per cent of Metro's stock and, together with his wife and certain trusts, controlled not less than 94 per cent of such stock. Metro performed all regular trust company functions. It acted as executor and administrator of estates, registrar, trustee, depositary, agent, real estate transfer agent, escrow agent, liquidation trustee, supervisor of management, and in other similar capacities. It also performed services in connection with various real estate reorganizations and liquidations. Decedent's principal job was to secure business for Metro. His management proved to be very successful. From cash assets of only a few hundred dollars in 1932, Metro reported gross income, surplus and undivided profits on its income tax returns for 1941 to 1946, inclusive, as follows: Surplus and
Year
Gross Income
Undivided Profits
1941
$300,596.40
$ 582,126.98
1942
266,178.52
633,526.02
1943
259,372.71
698,129.21
1944
262,228.08
784,019.33
1945
269,312.85
888,493.18
1946
332,080.61
1,020,223.03 In a number of liquidations *16 and reorganizations in which Metro acted as trustee or trust agent, decedent acted as a trust manager or voting trustee. In other instances, decedent secured business for Metro in states such as Missouri, where it was not licensed to operate, in which case he acted individually as a trustee or corporate officer; Metro, however, in every instance performed the real services. Decedent was paid for his services by the corporation to which the services were rendered, or by Metro where it was acting as trustee or agent for a corporation. Other officers of Metro acted in similar capacities. When decedent and other officers received compensation for such services, they paid over the sums received to Metro, who recorded the receipts of such sums in its "Sundry Income" account and reported and paid tax thereon on its Federal income tax returns. This practice had been followed for a number of years, and was customarily followed by trust companies and their officers in the Chicago area. Insofar as decedent was concerned, Metro's board of directors, at a meeting on April 12, 1934, adopted resolutions providing a salary for decedent on condition that all fees received by him from his services *17 as receiver, committee member, and any other income received by him from outside sources because of his connection with Metro throughout 1934, should be paid over to the corporation. Similar resolutions were adopted at directors' meetings in 1943, 1944, 1945, and 1946. When payment was made to decedent by check, he did not usually endorse it himself, but authorized a Metro employee to do so for him. In some instances, decedent received payment in the form of certificates of indebtedness which drew interest. These were likewise turned over to Metro. In 1944, decedent was appointed by the Circuit Court of Cook County, Illinois, to make an appraisal of a Chicago hotel. He turned over to Metro the fee received and such sum was reported on its return for that year. Set forth below are the amounts which decedent received from the indicated sources, and turned over to Metro during the years in question: 1941
1942
1943
1944
1945
1946
Voting trust fees
$ 7,469.79
$1,782.29
$ 6,575.00
$ 5,778.11
$1,650.23
Liquidation trust fees
1,899.98
166.66
4,366.66
2,000.00
1,400.01
$ 616.67
Certificates of indebtedness
3,622.70
3,172.35
3,952.99
2,761.42
Interest
474.40
106.62
514.25
Salaries as officer and/or
director
1,497.50
1,500.00
2,638.53
2,713.73
3,446.85
Appraisal fee
3,500.00
Total
$14,489.97
$5,595.70
$16,501.27 *
$17,192.31 **
$5,763.97
$4,063.52
*18 In 1941 and 1942, decedent received additional sums from similar sources which he retained and reported on his individual returns for such years. His reason for retaining such sums was to use them in financing the Public Administrator's Office to be hereinafter described. Respondent determined that all sums set forth above, received by decedent and turned over to Metro, were income to him and should have been so reported. Decedent's receipt of such sums, except those amounts which he conceded to be income to him, was in his capacity as an employee or agent of Metro; and was its income, not decedent's. (b) Income and loss from operation of the Office of Public Administrator. In March 1941, one John T. Dempsey (hereinafter referred to as Dempsey) was appointed Public Administrator of Cook County, Illinois, for a 4-year term expiring in December 1945. The duties of such office, generally, are the administration of estates of decedents *19 who have no relatives residing in Illinois. The Public Administrator functions under the direction of the Probate Court of Cook County. His administration of an estate continues until such estate is closed even though a new Public Administrator may have been appointed. The cost of operating the office and his compensation are paid from fees received by him. In April 1941, decedent, Dempsey, and one Don M. Peebles, an attorney (hereinafter referred to as Peebles), informally agreed on the operation of the Public Administrator's Office during the continuance of Dempsey's term as follows: "It is agreed between these parties that the office of Public Administrator shall be carried on as follows: "a. The activities of the office shall be directly handled by Rosset, or by Metropolitan Trust Company as agent, as Rosset shall hereafter determine, under the supervision of Dempsey. "b. Peebles shall be designated as general counsel for Dempsey as Public Administrator and shall be responsible for the conduct of all legal matters pertaining to the office. "All compensation received by Dempsey and Peebles for their services as administrator and attorney for the administrator, respectively, shall *20 be deposited in a general office account, withdrawals from this account to be under the direction of Rosset and Peebles. "Because of the fact that each one of the parties to this instrument will directly contribute toward the proper conduct of the office of Public Administrator and in order that each one of them may be properly and adequately compensated for his services to be rendered herein, it is agreed that disbursements out of this general office account shall be made as follows: "1. There shall be paid to Dempsey, in advance, beginning with the date of his appointment and confirmation and each month thereafter so long as he remains the duly commissioned Public Administrator of Cook County, Illinois, the sum of Twelve Hundred Fifty Dollars ($1250.). Prior to the time that the office account shall have been built up from earnings to an amount sufficient for the making of this payment, Rosset and Peebles will advance the amount, and they guarantee its payment during the period of the commission. "2. There shall thereafter be paid out of the office account the expenses of the maintenance of the office of Public Administrator on an efficient basis. Whatever remains shall be subject *21 to the control of Rosset and Peebles. "The parties will at all times cooperate together in the preparation and execution of all necessary documents, and Dempsey will be prepared at all times to execute such documents as may be required for proper conduct of the office, and he will at all times be available in connection therewith. "At the expiration of the tenure of office of Dempsey as Public Administrator of Cook County, it is recognized that certain estates will remain unclosed in which he has been acting as administrator. Dempsey agrees that he will continue to execute such documents as may be required of him and will in all respects fully cooperate in the matter of bringing these estates to a speedy termination. "Personnel of the office shall be selected by Peebles and Rosset after due consultation with Dempsey. "The importance of the Metropolitan Trust Company as a functioning entity experienced in probate matters is recognized by these parties and a part of the consideration of this agreement is the fact that Rosset has agreed to make the facilities of Metropolitan Trust Company available in any proper manner to the conduct of the office. "Proper quarters for the conduct of *22 the office of Public Administrator shall be selected by Rosset and Peebles, and the rental and all expenses in connection therewith shall be paid by these parties out of funds reecived or to be advanced by these parties." Because of criticism of past Public Administrators, decedent did not want Metro to appear as the vehicle for the actual administration of the duties of Public Administrator. This was the reason for decedent's personal participation in the arrangement with Dempsey and Peebles, both of whom understood, however, that he was joining with them in the agreement as the representative of Metro. Decedent advanced the necessary funds for establishing and maintaining the Public Administrator's Office, which was located in the same building as Metro. A part of the funds advanced were amounts which decedent had earned as voting trustee and corporate official, hereinbefore described, and which he retained in 1941 and 1942 for such purpose. Decedent paid over to Metro in 1944, 1945, and 1946 such sums as he received as his share of fees from the Public Administrator's Office, as follows: Year
Amount
1944
$11,500.00
1945
28,000.00
1946
48,385.00 In addition to the resolutions hereinbefore *23 referred to with reference to decedent paying over to Metro all fees and other income received by him from outside sources, the Secretary of Metro's Board of Directors, at a meeting on October 3, 1944, informed the directors that in connection with decedent's turning over the fees from the Public Administrator's Office, other employees of Metro, after September 13, 1944, had assumed the responsibilities of running that office in lieu of decedent. Respondent determined that the sums paid over by decedent to Metro were income to him. Decedent was an employee of Metro, and sums received by him from the Public Administrator's Office and paid over to Metro in 1944, 1945, and 1946 were its income and were properly excluded by decedent from his individual returns. Decedent claimed a loss of $667.18 on his return for 1945 from the operation of the Public Administrator's Office, which the respondent properly disallowed. Opinion Issues 1, 2, 3, 4, and 5 Respondent based his determination that decedent should have reported the amounts paid over to Metro as his own income on the ground that such sums constituted income to decedent within the meaning of Lucas v. Earl, 281 U.S. 111 (1930); Helvering v. Horst, 311 U.S. 112 (1940); *24 and Helvering v. Eubank, 311 U.S. 122 (1940). The decedent, on the other hand, argued that the above-cited cases are not applicable here because he was at all times an employee or agent of Metro, and that all sums here in question paid first to him and then by him to Metro were earned or received in that capacity; and, hence, were never income belonging to him, but always to Metro - his employer or principal. In commenting on the rule of the Earl case, the Court of Appeals said in Saenger v. Commissioner, 69 Fed. (2d) 631, 633 (C.A. 5, 1934): "The rule does not make taxable to one the income of another. It operates to prevent this occurring. If what is done in any case, no matter what form of words is used, amounts to the transfer of the right or title to that from which the income springs, the income follows the right. Likewise, if compensation paid to one is paid to him as the agent or servant in fact, not in fiction, of another, that income is taxable, not to the servant or agent as earner, but to its real earner, the principal. * * *" We agree with decedent that just such an employee or agency relationship is present here. Respondent, of course, has emphasized the fact that *25 decedent controlled about 94 per cent of Metro's stock. We do not, however, consider that to be of crucial importance. No suggestion has been made that Metro was not a bona fide corporation, and, as such, a complete, separate, legal and taxable entity. Decedent owned its stock; but he was also its president and chief officer and received compensation as such. We are satisfied that the positions of voting trustee, corporate officer or director, appraiser, and other positions from which he received "fees" or "compensation" were held always as an employee of Metro or as its agent and that the payments received by him and paid over to Metro were its income and not decedent's. The substance of his activity was to secure business for Metro; it could act only through his or some other employee's or agent's efforts. Whatever venture decedent entered was in that capacity and no other. His efforts from which income was derived were at all times impressed with the employee character of his position as Metro's president. This was not the siutation in the Earl, Horst, and Eubank cases, supra, where income of one taxpayer was assigned by one means or another to someone else. The income here was *26 initially the income of Metro and decedent acted only as a conduit. Cf. Mark D. Eagleton, 35 B.T.A. 551 (1937), affd. 97 Fed. (2d) 62 (C.A. 8, 1938); Nelson B. Updike, 22 B.T.A. 12 (1931); P. J. Clancy & Co., Inc., 12 B.T.A. 855 (1928). It is true that in 1941 and 1942 decedent retained a part of the fees collected by him. This was done, however, because it was intended that those funds be used to finance the establishment and operation of the Public Administrator's Office. While some room for doubt may exist as to the exact nature of the venture which decedent entered into concerning the operation of the Public Administrator's Office, we are satisfied from the whole record here that that operation, too, was entered into by him in behalf of Metro and not as a personal venture. Decedent explained at some length at the hearing that the conduct of the Administrator's Office had been the subject of much criticism in times past. He felt that the office could and should be conducted on an efficient businesslike basis; moreover, he was anxious to have Metro undertake the job and reap the profits from it. On the other hand, he felt that his efforts in guiding Metro through the depression *27 years had been highly successful, and that the corporation's reputation was good. He did not wish to risk the danger of its good name being subject to criticism by having it openly appear as the real functionary of Public Administrator until the conduct of that office proved to be successful under Dempsey's nominal administration. In any event, however, the income from that office which is in issue here was paid to Metro after it had assumed all of decedent's functions and responsibilities of operating it. We are satisfied that the income received by Metro was fair and reasonable compensation for its services; and while it may have been incumbent on decedent to have reported the income, he would have been entitled to an appropriate deduction for the amounts paid over to Metro. See Edwin J. McEnaney, 3 T.C. 552 (1944). With respect to the loss of $667.18 claimed by decedent on his 1945 return from the operation of the Administrator's Office, we agree with respondent that this must be disallowed. Since we regard decedent's activity with respect to this venture as that of an agent, any loss must be borne by Metro, the principal. In 1945, decedent paid over to Metro the sum of $28,000. *28 The alleged loss should have been deducted from this amount. The same result is true if we consider that decedent assigned his rights to the income to Metro in consideration of the salary to be paid to him and the assumption of his responsibilities by it. In either event, it is Metro's income; and any alleged loss must be borne by it. Having concluded that the amounts paid over by decedent to Metro were not his income, it is unnecessary to decide the second, third, and fourth alternative issues raised herein by decedent with respect to those sums. Findings of Fact Issues 6, 7, and 8 Preferential Dividends from Metro; Travel and Entertainment Allowance from Public Administrator's Office and Rail to Water Transfer Co. During the years in question, Metro paid directly transportation costs and hotel bills for trips which decedent made in connection with Metro's business. Decedent also drew $100 per week during such years for entertainment of Metro's clients and customers. All such sums were charged by Metro to "travel, entertainment" and "promotion" expenses; and on its return for the years in question it claimed deductions for all such expenses incurred by it through its employees, *29 as follows: Year
Amount
Amount
1941
Promotional
$ 101.10
Traveling and Enter-
tainment
7,618.05
$ 7,719.15
1942
Traveling and Entertainment
7,810.58
1943
Traveling, Entertainment and
Promotional
11,470.29
1944
Traveling and Entertainment
11,693.07
1945
Traveling and Entertainment
12,455.31
1946
Traveling, Entertainment and
Promotional
12,684.40 Decedent did not report as income, either the traveling expenses paid directly for him by Metro, or the weekly allowance of $100 which he drew from it. Respondent allowed a part of the amounts claimed by Metro as deductions to which it was entitled. He determined that decedent received preferential dividends in the form of the $100 weekly expense allowance, as follows: Year
Amount
1941
$5,200.00
1942
5,200.00
1943
2,600.00
1944
2,650.00
1945
2,600.00
1946
2,600.00
Respondent further determined that decedent received additional dividends from Metro in the form of traveling expenses paid directly by it for his benefit, as follows: Year
Amount
1943
$6,126.07
1944
5,873.19
1945
4,600.90
1946
4,678.93 Respondent also determined that Metro paid certain personal expenses of decedent which it charged to "miscellaneous expenses", and that such expenditures were additional dividend income to decedent, *30 as follows: Year
Amount
1944
$ 364.60
1945
684.89
1946
988.00
Respondent also determined that in 1944 Metro paid decedent $500 from its sale of a Cadillac automobile for $2,000. It had purchased the automobile from Mary E. Rosset for $1,500 in 1942. In March 1944 decedent and Peebles agreed that each would draw weekly allowances of $100 to defray entertainment costs and traveling expenses incurred in conducting the business of the Public Administrator's Office. Respondent determined that the following sums so drawn by decedent but not reported should have been included in his gross income: Year
Amount
1944
$5,300.00
1945
5,200.00
1946
1,400.00 Respondent also determined that decedent received additional income from the Public Administrator's Office not reported by him or by Metro, of $5,699.18 in 1943. From 1943 to 1946, inclusive, decedent managed a partnership - Rail to Water Transfer Company - which handled the transfer of coal from railroad cars to ships. A trust for decedent's son was one of the partners. Decedent received no compensation from the partnership; but Metro was compensated for services which it performed. Decedent drew a weekly allowance of $100 to cover the cost of entertainment *31 expenses and traveling which he incurred in carrying on the partnership's business. Respondent determined that the following amounts withdrawn by decedent from the partnership and not reported by him should have been included in his gross income: Year
Amount
1943
$ 800.00
1944
5,300.00
1945
5,200.00
1946
5,200.00
In entertaining in behalf of Metro, the Public Administrator's Office, and Rail to Water Transfer Company, decedent frequently did so at clubs and hotels where he maintained charge accounts. During the years in question, decedent also drew checks for "cash" which he used for entertainment. Set forth below are the checks payable to hotels and clubs and to cash drawn by decedent on his personal bank account: Clubs and
Year
Hotels
Cash
Total
1941
$4,363.83
$1,845.67
$6,209.50
1942
4,744.67
2,067.00
6,811.67
1943
3,221.39
2,250.00
5,471.39
1944
2,643.86
2,050.00
4,693.86
1945
2,624.78
850.00
3,474.78
1946
3,843.62
1,011.42
4,855.04
Traveling expenses paid directly by Metro, and so charged on its books, were not taxable income to decedent. On the other hand, amounts withdrawn by decedent from Metro, the Public Administrator's Office, and Rail to Water Transfer Company by way of weekly allowances, together with amounts *32 withdrawn as expenses from the Public Administrator's Office in 1943, were includible in his gross income. Decedent incurred deductible traveling and entertainment expenses which he paid from funds in his possession, as follows: Year
Amount
1941
$5,200.00
1942
5,200.00
1943
8,206.08
1944
7,040.79
1945
5,212.17
1946
7,282.56 Payments by Metro, in the sum of $2,037.49, which it deducted as "miscellaneous expenses", were additional income to decedent as determined by respondent in the amounts hereinbefore set forth. Opinion Issues 6, 7, and 8 The decedent testified at the hearing that the deductions claimed by Metro as traveling expenses paid directly by it for him were incurred by him in its behalf and that such direct payments were not for his personal benefit. We are satisfied that decedent's testimony was truthful and that the respondent erred in determining that a part of such payments made directly by Metro was additional income to decedent. A part of the expenses which Metro paid directly, for instance, was for trips to California. Decedent testified that Metro had business interests there and, at the time the trips were made, was anxious to secure additional interests. Decedent named the *33 persons with whom he talked and described the nature of the business concerned. Respondent, on the other hand, offered not one item of evidence to contradict the decedent's testimony. The decedent offered no evidence, however, with respect to the respondent's determination that deductions by Metro for "miscellaneous expenses" were payments by it for decedent's exclusive benefit; and, hence, were additional income to him. That determination is, therefore, upheld. As indicated by our findings, we cannot agree with decedent's argument that the sums received by him in the form of weekly allowances from Metro, the Public Administrator's Office, and Rail to Water Transfer Company, together with amounts withdrawn as expenses from the Public Administrator's Office in 1943, should not have been included in his gross income. To support his argument that such sums were not income to him, decedent relied principally on Commissioner v. Wilcox, 327 U.S. 404 (1946), and Ned Wayburn, 32 B.T.A. 813 (1935). The Wilcox case concerns the taxability of embezzled funds to the embezzler. It is obviously inapplicable to the facts here. Our holding in the Wayburn case, too, is pertinent only to the facts *34 set forth therein. Decedent drew the money here in question for entertainment expenses and possibly for traveling. We cannot find, however, that he was so firmly impressed with the duty of spending it for that and nothing else that he became a trustee or fiduciary of the amounts received. We do agree with decedent's argument that a part of the sums received was used for business expenses and should be deductible. He was able, however, to substantiate expenditure of only a part of the sums received by him. For the years 1941 and 1942, we have allowed a deduction for the actual amounts withdrawn and for the subsequent years we have allowed a deduction in excess of the total of his personal checks drawn to hotels and clubs and for cash because we believed his testimony that additional sums had been so spent. Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2, 1930). He testified that he frequently entertained railroad presidents and others holding equally important positions in the business world. Even though we considered this fact, we are unable to allow any further amounts with no more complete evidence than was offered. Lucien I. Yeomans, 5 T.C. 870 (1945). Decedent failed to show *35 that he either did, in fact, report the $500 paid to him in 1944 by Metro from the sale of a Cadillac automobile, or that such sum was not income to him. The respondent's determination is, therefore, upheld. Findings of Fact Issue 9 Miscellaneous Fees of $775. In his deficiency notice, the respondent determined that decedent received $875 of miscellaneous fees in 1941 which he did not report on his return for that year. Respondent conceded on brief that $100 of that amount had been reported. Opinion Issue 9 Decedent testified that $300 of the amount in question had been received by him as reimbursement for expenses incurred in making an appraisal of a hotel in Waco, Texas. If that be so, decedent offered no supporting evidence of any kind. The Cohan [2] rule does not presuppose an allowance for alleged expenses merely for the asking. The remaining $475, decedent was unable to identify, but contended that that amounts was a duplication of amounts which he had reported. In the absence of any evidence corroborating that assertion, we cannot accept it. The respondent's determination that decedent received additional fees of $775 which he did not report on his return for 1941 is upheld. *36 Findings of Fact Issues 10 and 11 Loss on Guaranty and Attorney's Fees. In 1930, the United States Fidelity and Guaranty Company (hereinafter referred to as the Insurance Company) executed a bond insuring the People of Illinois against loss of public funds held by the Treasurer of Cook County. In 1931, the Cook County Treasurer deposited $100,000 of public monies in the Phillip State Bank & Trust Company (hereinafter referred to as the Bank) of which decedent was majority stockholder and Board Chairman, and of which one C. A. Beutel (hereinafter referred to as Beutel) was president, and Michael J. Long (hereinafter referred to as Long) was vice-president and cashier. In lieu of collateral or some other type of security for the deposit, decedent, Beutel, and Long executed a surety bond for $100,000 guaranteeing the People of Illinois against loss of the deposit. The Bank subsequently was closed by the Auditor of Public Accounts of Illinois on June 21, 1932, and was still in liquidation on August 18, 1941. On that date, decedent, Beutel, and Long agreed to settle their liability on their bond by payment of $20,000 by decedent and of $7,500 by Beutel and *37 Long. Decedent issued his check for $20,000 to the Insurance Company on that date and was completely released from any further liability. Incident to the payments, decedent, Beutel, and Long "[waived] and [released] all claims which they may have [had] for recoupment, reimbursement or subrogation in connection with the claim of United States Fidelity and Guaranty Company filed and allowed in the Phillip State Bank and Trust Company Receivership * * *". A resolution of the Insurance Company's Board of Directors, unanimously adopted on August 20, 1941, recited the above-described guaranty transactions and settlement and expressed the Directors' approval of such settlement. In connection with the settlement of his liability, decedent incurred and paid legal costs as follows: Paid on November 1, 1941
$ 500.00
Paid in 1944
1,500.00
Decedent was not in the business of lending money to corporations or guaranteeing their indebtedness. On his return for 1941, decedent claimed a deduction of $20,500 for the amount paid to the Insurance Company and for legal fees in connection therewith. On his return for 1944, he claimed a deduction from adjusted gross income of $1,500 for legal fees paid in that *38 year. Respondent disallowed both the deductions claimed in 1941 and 1944. Opinion Issues 10 and 11 Decedent claimed the deductions in question as expenses incurred in trade or business or as nontrade or [nonbusiness] expenses incurred in the production of income, under sections 23(a)(1)(A) or 23(a)(2), [3] respectively, of the Internal Revenue Code of 1939. Respondent based his disallowance of the deduction of the payment and legal fees, and so argues on brief, on the theory that no loss was proved because decedent failed to demand reimbursement for the amount paid by him from Beutel and Long. We find that *39 argument without merit. It is readily apparent from an examination of the settlement agreement and the resolution adopted by the Insurance Company's Board of Directors incident thereto that the liabilities of all of the parties concerned, including any claims between decedent and Beutel and Long, were settled by the payments of $20,000 which decedent made and $7,500 made by Beutel and Long. On the other hand, we cannot agree with decedent's argument that the payment made on his guaranty is deductible either under section 23(a)(1)(A) or 23(a)(2) of the 1939 Code. He was not in the "trade or business" of lending money to corporations, guaranteeing their indebtedness, or going surety for bank deposits. The liability assumed by him here was only incidental to his position as Board Chairman and major stockholder of the Bank. And, in any event, the payment made by him is not an "expense" within the meaning of section 23(a); nor is it a "loss" within the meaning of section 23(e)(2). [4] *40 However, the fact remains, that in common parlance, decedent sustained an out-of-pocket "loss" of $20,000 as the result of the payment on his guaranty. When he paid that sum in full settlement of his liability under the surety bond, the law raised a debt in his favor against the Bank - the principal debtor. Peter Stamos, 22 T.C. 885 (1954); George Aftergood, 21 T.C. 60 (1953); Kate Baker Sherman, 18 T.C. 746 (1952). Decedent is, therefore, entitled to a deduction for the payment as a "Bad Debt" under section 23(k)(1)[5] *41 of the 1939 Code, since the transaction here in question occurred in 1941, prior to the effective date of section 23(k)(4), relating to nonbusiness bad debts. Barnhart-Morrow Consolidated, 47 B.T.A. 590 (1942), affd. 150 Fed. (2d) 285 (C.A. 9, 1945); Alice duPont Ortiz, 42 B.T.A. 173 (1940), revd. sub nom. Helvering v. Wilmington Trust Co., 124 Fed. (2d) 156 (C.A. 3, 1941), revd. 316 U.S. 164 (1942). With respect to the legal expenses incurred and paid by decedent in 1941 and 1944 in connection with the settlement of his guaranty liability, our recent case of Peter Stamos, supra, [6] decided this issue in decedent's favor and we shall follow that holding here by allowing such expenses to be deducted under section 23(e)(2). Findings of Fact Issue 12 Bad Debt Loss. On May 31, 1940, decedent loaned $1,000 to one William Siegel. On December 28, 1942, Siegel filed a petition for bankruptcy in the United States District Court for the Northern *42 District of Illinois, Eastern Division. Listed among Siegel's unsecured debts was the $1,000 loan from decedent. That court, on January 4, 1943, adjudged Siegel a bankrupt, and he was so discharged on February 28, 1944. On November 30, 1943, decednt loaned Siegel and a partner $50,000 on a secured note, due January 30, 1944, which was duly paid. Decedent never demanded payment of the $1,000 loan from Siegel. Decedent failed to prove that the $1,000 loan to Siegel became worthless in 1942. Opinion Issue 12 The basis for the respondent's disallowance of a deduction in 1942 for the worthlessness of the $1,000 Siegel loan was because decedent did not establish that fact to his satisfaction - nor did decedent do so to ours. To be sure, proof of Siegel's bankruptcy in 1942 is a step in the direction of proving the worthlessness of the loan. However, we do not know the due date of the loan, or if it had any value prior to 1942. Nor are we able to find that decedent made any effort to collect the loan. On the contrary, the decedent testified that "I never asked him for it" and, in response to the question, "Why didn't you ask him for it", he stated, "That is my business". Gratuitous forgiveness *43 of a debt affords no grounds for a claim of worthlessness. Lidgerwood Manufacturing Company, 22 T.C. 1152 (1954), on appeal C.A. 2 and C.A. 3, December 3, 1954; George F. Thompson, 6 T.C. 285 (1946), affd. 161 Fed. (2d) 185 (C.A. 2 1947). And it may be that the correct inference to be drawn from decedent's testimony, in addition to the fact that he subsequently loaned $50,000 to Siegel and another, is that he forgave the debt. Suffice it to say that the proof offered is wholly inadequate to establish that the loan became worthless in 1942, so as to have entitled decedent to a bad debt deduction therefor on his return for that year. Findings of Fact Issue 13 Compensation Received in 1942 and Reported Pursuant to Section 107(a) of the Internal Revenue Code of 1939. In 1942, decedent received the following sums from the indicated sources: Main Colfax Corporation
$3,000.00
2734 Pine Grove Building Corporation
1,000.00
Parkington Manor
147.93
Kedzie-Cullom Building
115.75
Hyde Park
165.00
Lakeview
108.06
5051 Kenmore, Inc.
320.54
2235 East 71st Street Apts., Inc.
270.47
$5,127.75
Decedent reported only $177.64 of the amounts received, on his return for 1942, because he claimed the benefits of section 107(a) of the Internal Revenue Code of 1939. *44 Respondent determined that $108.60 of the total amount received was currently reportable interest, to which the decedent agreed. He further determined that the balance of the sums not reported in 1942 was not reportable under section 107(a), and included such balances in decedent's gross income for 1942. Opinion Issue 13 Section 107(a) permits a taxpayer to reduce his tax liability on compensation received in one year where the services performed extended back for three or more years. To claim the benefit of this section, however, the taxpayer must definitely establish certain specific facts with reference to the services performed and the compensation received. It must be shown that the services were continuous and actually performed over a period of 36 or more months; and that the compensation received in one year, and for which the benefits of section 107 are claimed, was more than 80 per cent of the total compensation received for such services. The proof which the decedent offered was confined solely to his testimony, which amounted to nothing more than his affirmance that the information on his return (except for the item of interest) was correct. Obviously, this is insufficient. *45 We have no substantiating evidence that the amounts received by him in 1942 were, in fact, 80 per cent or more of the total compensation for the services rendered. We, therefore, conclude that the evidence, or lack thereof, requires us to uphold the respondent's determination that the amounts in question should have been included by decedent in gross income on his return for 1942, and that the benefits of section 107(a) were not applicable thereto. Findings of Fact Issue 14 Unreported Deduction for Social Security Taxes. In 1942 decedent received $1,000 from Marmaduke Apartments, Inc., as compensation for his personal services as its president. Marmaduke withheld $10 of the amount for social security taxes. Decedent reported $990 as compensation from this source on his return for 1942. Respondent determined that the amount withheld should also have been reported by decedent. Respondent also determined that voting-trust fees of $100 were received by decedent in 1942, were not reported by him or by Metro, and were his income. Opinion Issue 14 The only argument which decedent offered to rebut the respondent's determination is that "So far as we can determine this $10 item was not included *46 in the statutory letter." The revenue agent's report shows in detail the composition of the adjustment increasing gross income in the 1942 deficiency notice for "Salaries" by $3,832.36, as follows: Income
Unreported
Marmaduke Apartments, Inc.
$ 10.00
Main Colfax Corporation
2,889.12
2734 Pine Grove Building Corp
933.24
$3,832.36
Sums withheld from an employee's wages for his social security tax are includible in his gross income. The respondent's determination is upheld. Decedent failed to show that voting-trust fees of $100 received in 1942 were reported on his return for that year or that such fees were not his income. The respondent's determination is, therefore, upheld. Findings of Fact Issue 15 Long-Term Capital Gain on Sale of Certificate of Indebtedness. In 1942 decedent received a payment of $137.56 on a certificate of indebtedness of Clyde Manor. Decedent reported 50 per cent of the amount received in 1942 as a long-term capital gain. Respondent disallowed such treatment and determined that the entire amount should have been reported as compensation. Opinion Issue 15 Decedent testified that this particular Clyde Manor certificate had been purchased by him in 1936 or 1937 and that *47 its cost basis had been reduced to zero at the time the payment in 1942 was received. He offered no evidence to substantiate his testimony and when asked to produce any pertinent records, he said, "I won't bother". We conclude that the respondent correctly determined that the amount of $137.56 received by decedent in 1942 was additional ordinary income. Findings of Fact Issue 16 Madison Park Hotel Stock. Prior to June 26, 1942, petitioner, Mary E. Rosset, bought 2,133 1//2 shares of stock of the Madison Park Hotel Company for $21,295.72. On December 26, 1942, the corporation made a capital distribution of $17 per share on this stock, and she received $36,269.50. After June 26 but before December 26, 1942, petitioner, Mary E. Rosset, bought 1,307 1/2 additional shares of Madison Park stock for which she paid $34,178.13. The corporation also made a capital distribution of $17 per share on these shares on December 26, and she received $22,227.50. None of the Madison Park shares were sold in 1942. On her return for that year, she reported a net long-term capital gain from the above-described distribution, as follows: Total proceeds received
$58,497.00
Less total cost
55,473.85
Net gain
$ 3,023.15
*48 Respondent determined that petitioner, Mary E. Rosset, received a net long-term capital gain of $14,973.78 from the distribution on the shares purchased by her prior to June 26, 1942, pursuant to section 115(d) [7] of the Internal Revenue Code of 1939. With respect to the shares purchased after June 26, he determined that the amount of the capital distribution served merely to reduce her basis in such shares because such distribution was less than the cost thereof. Opinion Issue 16 We do *49 not understand that petitioner any longer seriously disputes the correctness of the respondent's determination. On brief she says: "We recognize that under section 115(d) of the Internal Revenue Code then in effect the respondent's position is technically correct if he has the right to redetermine the capital gain." We agree. This reference to the respondent's "right to redetermine the capital gain" concerns her claim that the adjustment in question did not occur until after the statutory period of limitation, in which adjustment of the 1942 return could be made, had expired. Here again, however, petitioner recognizes that the 1943 joint return is open and that our holding in Lawrence W. Carpenter, 10 T.C. 64 (1948), and subsequent similar cases, permits adjustments to be made to 1942 income because of the Current Tax Payment Act of 1943. [8]
Her only real argument is that the respondent's adjustment, and the fact that he is able to make it, is harsh. The precedents are against petitioner on this issue and the respondent's determination is upheld. Findings of Fact Issue 17 Alleged Loss on 2920 Commonwealth Building Corporation Stock. In 1933 decedent and Mary E. Rosset *50 purchased shares of stock in the 2920 Commonwealth Building Corporation in order to qualify as tenant-owners of one of the apartments in the building. They occupied the premises until 1938, but after moving from the apartment retained the stock. In 1943 the mortgagee purchased the property; and on their joint return for that year decedent and petitioner claimed an ordinary loss of $1,500 for the alleged worthlessness of the shares. Respondent disallowed the deduction. Opinion Issue 17 Respondent based his determination on two grounds: (1) that the shares in question were not purchased in a transaction entered into for profit; and (2) that such shares were not proven to have become worthless in 1943. Even assuming the shares in question had been held in the expectation of making a profit, the first essential element necessary to substantiate the claimed loss is not shown - namely, that the shares had some value at the beginning of 1943. Roosevelt Investment Corporation, 45 B.T.A. 440 (1941). The respondent's determination is, therefore, upheld. Decisions will be entered under Rule 50. Footnotes
1. 57 Stat. 126.↩
*. Decedent conceded that $27.50 of such amount was not turned over to Metro, was unreported, but should have been reported by him. ↩
**. Decedent conceded that $8.84 of such amount was not turned over to Metro, was unreported, but should have been reported by him.↩
2. Cohan v. Commissioner, supra.↩
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *
(2) Non-trade or Non-business Expenses. - In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.↩
4. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *↩
5. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; * * *. This paragraph shall not apply in the case of a taxpayer, * * * with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. * * *
(3) Definition of Securities. - As used in paragraphs (1), (2), and (4) of this subsection the term "securities" means bonds, debentures, notes, or certificates, or other evidences of indebtedness, issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form.↩
6. Acquiesced IRB 1954-50, p. 6.↩
7. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. * * *
(d) Other Distributions from Capital. - If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. This subsection shall not apply to a distribution in partial or complete liquidation or to a distribution which, under subsection (f)(1), is not treated as a dividend, whether or not otherwise a dividend.↩
8. 57 Stat. 126.↩